UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
GULF ISLANDS LEASING, INC.,                :

        Plaintiff,                          :

        -against-                            :

BOMBARDIER CAPITAL INC.,                   :

        Defendant.                         :
------------------------------------X
BOMBARDIER CAPITAL INC.,                   :

        Counterclaim-Plaintiff,            :

        -against-                          :

GULF ISLANDS LEASING, INC.,                :

        Counterclaim-Defendant.            :
------------------------------------X
BOMBARDIER CAPITAL INC.,                   :

        Cross-Claim Plaintiff,             :

        -against-                          :

ANDREW L. EVANS and ANN L. EVANS,          :

        Cross-Claim Defendants.            :
------------------------------------X

02 Civ. 2839 (WHP)

OPINION AND ORDER

WILLIAM H. PAULEY III, District Judge:

        Plaintiff Gulf Islands Leasing, Inc. ("Plaintiff" or "Gulf") brings this breach of contract action arising from certain penalties assessed by Defendant Bombardier Capital Inc. ("Defendant" or "BCI") pursuant to a loan agreement, dated July 31, 2000 (the "Loan Agreement"). BCI asserts a counterclaim against Gulf seeking indemnification for losses allegedly sustained in connection with the Loan Agreement and cross-claims against Andrew L.

Evans and his wife, Ann L. Evans, the guarantors of Gulf's obligations. Jurisdiction is appropriate pursuant to 28 U.S.C. § 1332, venue is proper under 28 U.S.C. § 1391 and on November 28 and 29, 2005, this Court conducted a bench trial. Insofar as the Court exercises its prerogative as finder of fact to determine the weight and credibility of the evidence, the discussion herein is limited to the evidence that this Court credits. Further, this Court recites only those findings of fact that are relevant to its conclusions of law.

## FINDINGS OF FACT

Gulf owns, operates, manages and charters jet aircraft for use by Mr. and Mrs. Evans and their corporations. It is incorporated and maintains its principal place of business in the state of Washington. (Joint Pre-Trial Order, dated May 6, 2005 ("JPTO") at 2.) The Evanses are the sole shareholders and Mr. Evans is Gulf's Chairman. (Trial Transcript ("Tr.") at 55.)

Bombardier Inc. ("Bombardier"), a Canadian corporation, is a leading manufacturer of aircraft. Bombardier Aerospace Corporation ("BAC") is a United States subsidiary that sells fractional interests in jet aircraft through its Flexjet program. This program offers corporations and individuals access to a fleet of aircraft without the maintenance, storage and operating expenses of ownership. (Tr. at 15, 114-15.) BCI is Bombardier's United States lending subsidiary and is incorporated in Massachusetts with its principal place of business in Vermont. (JPTO at 2.) While BCI and BAC are both subsidiaries of Bombardier, they operate independently with different officers, directors and corporate structures. (Tr. at 111-13.)

In the summer of 1999, BAC approached Gulf with an opportunity to purchase a fractional interest in a "Global Express" aircraft (the "Global") that included the necessary

financing. (Tr. at 15-16.) Because a Global was not available for "green delivery"[1] until January 2000, Gulf purchased a fifty percent interest in two "Challenger" aircraft with the understanding that eventually, those interests would be exchanged for a fifty percent interest in a Global. (Tr. at 16-17.) The Challenger phase of this aircraft transaction closed in September 1999. (Tr. at 16.) BAC loaned Gulf $19,600,000 pursuant to a Loan Agreement, dated September 30, 1999, and agreed "to allow the Loan to be converted into a financing for an interest in the [Global]." (Trial Exhibit ("Tr. Ex.") 44.)

Green delivery of a Global was delayed and in July 2000, the parties began documenting the Global phase of their aircraft transaction. (Tr. at 18.) In connection with acquisition of its fifty percent interest in a Global, Gulf entered several agreements with various Bombardier entities including, but not limited to, (1) a Purchase Agreement, dated July 31, 2000 (the "Purchase Agreement") with Bombardier Business Jet Solutions Inc. ("BBJSI"); (2) a Management Agreement, dated July 31, 2000 (the "Management Agreement") with BAC; (3) the Loan Agreement with BCI; and (4) a Security Agreement, dated July 31, 2000 (the "Security Agreement") with BCI. (Tr. Exs. 1-3, 5.) Gulf, BAC and BBJSI memorialized additional terms of the Global transaction in a Sideletter Agreement, dated July 31, 2000 (the "Sideletter Agreement"). (Tr. Ex. 7.) In addition, Gulf's obligations under the Loan Agreement were guaranteed by Mr. and Mrs. Evans (the "Guaranty"). (Tr. Ex. 6.)

Pursuant to the Loan Agreement, BCI provided $16,339,488.50 in financing to Gulf at a fixed interest rate of eight percent. (Tr. Ex. 3.) The Loan Agreement contemplated repayment in sixty-eight monthly payments of $138,849.05 with a final payment of

---

[1] "Green delivery" refers to delivery of an aircraft before interiors and optional avionics are installed. While green aircraft can fly, they are not suitable for passenger travel. (Tr. at 51, 124-25.)

$13,776,093.56. (Tr. Ex. 3.) In addition to the monthly payments due under the Loan Agreement, the Management Agreement and Sideletter Agreement obligated Gulf to compensate BAC monthly for aircraft management services. (Tr. Exs. 2 & 7.) In November 2000, consistent with its policy of minimizing interest rate risk, BCI entered into an interest rate swap transaction with SunTrust Equitable Securities Corporation ("SunTrust") to hedge its fixed rate exposure on the Gulf loan. (Tr. at 122-24, 203-04, 211-13; Tr. Ex. 39.) BCI never disclosed this swap transaction to Gulf. (Tr. at 33-34, 95-96.)

Gulf accepted green delivery of a Global on August 25, 2000, at Bradley International Airport in Windsor Locks, Connecticut. (Tr. Ex. 1.) The aircraft then flew to a completion center in California for outfitting to Gulf's design specifications. (Tr. at 51, 124-25.) In December 2000, however, citing deficient BAC management services and an irreversible deterioration of the parties' relationship, Gulf notified BAC and BBJSI of its intention to terminate all agreements in connection with the Global transaction. (Tr. Ex. 38.) While Gulf preferred to negotiate a resolution, it was prepared to commence litigation and furnished BAC and BBJSI with a copy of its proposed complaint. (Tr. Ex. 38.)

On January 23, 2001, BAC declared Gulf in default of its obligations under the Management and Purchase Agreements for failure to remit management fees in the amount of $693,649.69. BAC also advised Gulf that it was exercising its right under the Purchase Agreement to repurchase Gulf's Global interest and that BAC and BBJSI had filed a lawsuit in the United States District Court for the Northern District of Texas (the "Texas Action"). (Tr. Ex. 14.) That same day, Gulf filed its lawsuit in the King County Superior Court in Washington (the "Washington Action"). (Tr. Ex. 11; Tr. at 27-28.) On January 24, 2001, Gulf remitted

4

$693,649.69 to BAC to cure any perceived default and requested that BAC dismiss the Texas Action. (Tr. Ex. 15.)

Following a protracted mediation, on December 21, 2001, Gulf and BAC, doing business as BBJSI, entered into a Confidential Settlement Agreement (the "Settlement Agreement") to resolve all claims raised in the Texas Action, the Washington Action and any other dispute arising prior to that date. (Tr. Ex. 11.) The parties agreed, however, that "nothing in this Settlement Agreement shall affect the rights of [Gulf] with regard to [BCI] and no terms of this agreement shall be construed to include BCI or affect its relationship with Gulf Islands unless it is specifically referred to therein." (Tr. Ex. 11.) The parties agreed that on February 1, 2002 (the "Closing Date"), BAC would repurchase Gulf's Global interest for $20,216,000, the "Fair Market Value" determined under Section 4(a) of the Purchase Agreement, and Gulf would remit $165,368.94 in outstanding management fees. (Tr. Ex. 11.) The total repurchase amount payable to Gulf would be reduced by the outstanding amount Gulf owed BCI under the Loan Agreement. The parties further agreed to provide mutual releases and terminate the Purchase Agreement, Management Agreement, Sideletter Agreement and certain other agreements executed in connection with the Global transaction. (Tr. Ex. 11.) Finally, a Closing Statement would be delivered "describing the financial aspects of the transaction and confirming the purchase price, the adjustments and payments to BCI as, but only as, agreed to" in the Settlement Agreement. (Tr. Ex. 11.)

On January 29, 2002, BAC provided a statement to Gulf reflecting a total amount of $17,865,370.04 due BCI under the Loan Agreement. This amount included a "Make Whole" amount of $923,351.72 (the "Make Whole Fee") and a "Breakage" amount of $1,169,200 (the "Breakage Fee"). (Tr. Ex. 17.) According to BCI, the Make Whole Fee compensated BCI "for

5

the loss of earnings due to early termination of the agreement." (Tr. at 132.) BCI assessed the Breakage Fee for the cost it incurred to unwind the SunTrust swap transaction.

Gulf objected to the Make Whole and Breakage Fees and ultimately, BCI withdrew the Breakage Fee. (Tr. at 36-39; Tr. Ex. 9.) On the Closing Date, Gulf paid the Make Whole Fee, but reserved its right to challenge such assessment in the Closing Statement:

> The payoff to Bombardier Capital is without prejudice to Gulf Islands and Evans [sic] rights to assert that the make whole and miscellaneous charges or any penalties are not due. Gulf Islands and Evans reserve all rights against Bombardier Capital, Inc.

(Tr. Ex. 13.)

After the closing, Gulf sought repayment of the Make Whole Fee asserting that because BAC exercised a purchase option pursuant to the relevant Purchase Documents, no fee was due under Section 2.4 of the Loan Agreement. (Tr. Ex. 18.) Although BCI agreed that no such fee applies on purchases under the Purchase Documents, it maintained that the settlement purchase "was not pursuant to the Purchase Documents, but rather was pursuant to settlement discussions and, in fact, was integral to the resolution of the dispute between [Gulf] and [BAC]." (Tr. Ex. 20.)

Thereafter, Gulf filed this action on April 12, 2002 asserting claims for breach of contract, unjust enrichment and declaratory judgment in connection with its payment of the Make Whole Fee. (First Amended Complaint, dated May 10, 2002 ¶¶ 18-27.) BCI counterclaimed against Gulf for the Breakage Fee and cross-claimed against Mr. and Mrs. Evans on their personal guarantees. (Answer, Counterclaim and Cross-Claim, dated May 20, 2002 ¶¶ 28-47.)

CONCLUSIONS OF LAW

This Court must determine two issues: (1) whether Gulf's payment of the Make Whole Fee was appropriate under the Loan Agreement; and (2) whether BCI is entitled to collect a Breakage Fee under the Security Agreement. Both questions turn on an interpretation of the contracts governing the Global transaction.

I.  Contract Interpretation Under New York Law

Both the Loan Agreement and Security Agreement are, by their terms, governed by New York law. (Tr. Exs. 3, 5.) Because the parties have not argued otherwise, this Court concludes that New York law applies. See Collins v. Harrison-Bode, 303 F.3d 429, 433 n.1 (2d Cir. 2002); VKK Corp. v. Nat'l Football League, 244 F.3d 114, 129 n.10 (2d Cir. 2001).

"In New York, if a contract is straightforward and unambiguous, its interpretation presents a question of law for the court to be made without resort to extrinsic evidence." LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 205 (2d Cir. 2005) (internal quotation omitted); see also Postlewaite v. McGraw-Hill, Inc., 411 F.3d 63, 67 (2d Cir. 2005). A contract is ambiguous "where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and . . . is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Broder v. Cablevision Sys. Corp., 418 F.3d 187, 197 (2d Cir. 2005) (internal quotation omitted). In contrast, unambiguous contract terms have "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." Krumme v. Westpoint Stevens Inc., 238 F.3d 133, 139 (2d Cir. 2000) (internal

7

quotation omitted); see also Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1192 (2d Cir. 1996). Courts must determine whether contract language is ambiguous "from the face of the agreement, without reference to extrinsic evidence." Collins, 303 F.3d 429, 433 (2d Cir. 2002).

Moreover, the words and phrases of a contract should be afforded their plain meaning and "construed so as to give full meaning and effect to all of its provisions." LaSalle Bank, 424 F.3d at 206 (internal quotation omitted); see also Shaw Group, Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 124 (2d Cir. 2003). Further, an interpretation "that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible." LaSalle Bank, 424 F.3d at 206 (internal quotation omitted).

II.     The Make Whole Fee

Section 2.4 of the Loan Agreement governs the assessment of a Make Whole Fee and provides that such fee is inapplicable in the following circumstances:

> If [BBJSI] exercises any purchase options pursuant to the relevant Purchase Documents, [Gulf] shall promptly notify [BCI] thereof and, on the date that the Aircraft is purchased by [BBJSI], [Gulf] shall prepay the aggregate unpaid principal amount of the Note, together with accrued interest thereon to the date of prepayment.

(Tr. Ex. 3.) Gulf and BCI agree that their dispute in this action regarding the Make Whole Fee concerns the interpretation of this provision. It is also undisputed that the term "relevant Purchase Documents" is defined by the Loan and Security Agreements to include the Purchase Agreement. This definition, however, does not include the Settlement Agreement. (Tr. Ex. 3, 5.)

8

Although both Gulf and BCI contend that Section 2.4 is unambiguous, each offers a different interpretation. Gulf asserts that the term "purchase options" should not be limited to the various purchase alternatives enumerated in the Purchase Documents, but may be read broadly to include the Settlement Agreement transaction. BCI argues that "purchase options" are those designated in the Purchase Documents and that the Make Whole fee applies because BAC repurchased Gulf's interest pursuant to the Settlement Agreement, not the Purchase Documents.

"The language of a contract is not made ambiguous simply because the parties urge different interpretations. Nor does ambiguity exist where one party's view strain[s] the contract language beyond its reasonable and ordinary meaning." Seiden Assocs. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992) (internal quotation omitted). In determining whether a contract is ambiguous, this Court must recognize and attribute the plain meaning to all terms and avoid an interpretation resulting in surplusage.

Gulf contends that Section 2.4 should broadly extend to any repurchase exercised within the spirit of the Purchase Documents. (Tr. at 58.) This Court disagrees. Black's Law Dictionary defines the term "pursuant to" to mean "in compliance with; in accordance with; under; as authorized by;" or "in carrying out." Black's Law Dictionary 1272 (8th ed. 2004). Thus, this Court finds that "purchase options pursuant to the relevant Purchase Documents" unambiguously means the options expressly set forth or authorized by those documents. If these sophisticated parties intended this provision to encompass any repurchase by BAC, they could have negotiated language to invoke such a meaning. They did not. See Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams., No. 04 Civ. 10014 (PKL), 2005 WL 1950116, at *4 (S.D.N.Y. Aug. 12, 2005) ("Where unambiguous, courts are to interpret contractual language pursuant to its plain meaning, especially when dealing with sophisticated, counseled business

people negotiating at arm's length.") (internal quotation omitted); Am. Home Assurance Co. v. Merck & Co., 329 F. Supp. 2d 436, 444 (S.D.N.Y. 2004) ("As a general rule, the Court may not reinvent an obviously straightforward contract clause that was signed and executed by two sophisticated parties."). Accordingly, this Court concludes that the operable provision of Section 2.4 of the Loan Agreement is not ambiguous and means that only purchases exercised in accord with the Purchase Documents are not subject to a Make Whole Fee.

This Court must next determine whether BAC exercised a purchase option "pursuant to the relevant Purchase Documents" when it repurchased Gulf's interest under the Settlement Agreement. This Court concludes that it did not. The Settlement Agreement is not a "Purchase Document" as that term is defined by the Loan and Security Agreements and does not effect one of the purchase options set forth in the Purchase Agreement. (Tr. Exs. 3, 5.)

To the extent Gulf maintains that BAC's repurchase under the Settlement Agreement was made pursuant to Section 4(c) of the Purchase Agreement, this Court disagrees. (Tr. at 58-64.) Section 4(c) provides:

> [BBJSI] shall have the option (but not the obligation), in addition to any other remedies to which [BBJSI] may be entitled, upon a material default or Event of Default by [Gulf] related to the Aircraft or [Gulf's] Interest under any of the Governing Documents, to repurchase [Gulf's] Interest in the same manner and on the same terms and conditions as set forth in Section 4(b) hereof; provided, however, that such repurchase price shall be further reduced by 20 percent for liquidated damages caused by [Gulf's] default and not as a penalty, which such reduction [BBJSI] shall receive.

(Tr. Ex. 1.)

Contrary to Gulf's contentions, the terms of BAC's repurchase under the Settlement Agreement do not track Section 4(c) of the Purchase Agreement. As set forth above, Section 4(c) allows BAC to repurchase Gulf's interest (1) where an event of default has

10

occurred; and (2) for a price reduced by a twenty percent liquidated damages amount. (Tr. Ex. 1.) Mr. Craig S. Sternberg, the President and Secretary of Gulf, admitted that these elements were not satisfied with his testimony that Gulf was not in default and that liquidated damages were never charged. (Tr. at 63-64.) Thus, this Court concludes that the Settlement Agreement transaction was not a Section 4(c) repurchase.

Finally, Gulf's argument that its prepayment of the BCI loan was involuntary and, thus, not subject to the Make Whole Fee, is unavailing. In the Settlement Agreement, Gulf represented and warranted:

> [It] read the foregoing Agreement and know[s] and understand[s] its contents and that [it has] had the opportunity to consult, and [has] consulted, with [its] attorneys retained to represent [it] in this matter, on the terms and implications of this Agreement and that [it] has executed this Agreement under [its] own free will and action.

(Tr. Ex. 11.) Notably, Gulf never consulted with BCI during the negotiation of the Settlement Agreement to understand Gulf's potential exposure on the loan. When the Court explored this issue with Mr. Sternberg at trial, he offered no reasonable explanation for Gulf's failure to approach BCI:

> THE COURT: [W]hy didn't Gulf Islands communicate directly with the defendant about that settlement agreement and make certain what its financing arm's position was going to be . . . ?
>
> MR. STERNBERG: I was told by Haynie and others not to contact Bombardier Capital, which in retrospect now makes me feel like I have been taken advantage of, but we were told not to contact Bombardier Capital. And I don't know why not.
>
> THE COURT: But how does that make sense, that the entity with whom you are going to do business tells you not to contact the entity with whom you have a 16 million-dollar liability, or whatever it was at the time, and you decide to follow the advice of . . . the opposite side of the transaction, and not clear things up with your banking arm?

> MR. STERNBERG: The relationship with Bombardier was strained, and it was a strange relationship. And the relationships within Bombardier were strange.
>
> THE COURT: Wouldn't that be all the more reason to worry about, as the debtor, . . . what the obligation was going to be?
>
> MR. STERNBERG: In retrospect? Yes. At the time, [Y]our Honor, . . . we were asked not to; I don't know why. . . . Bombardier Capital was always the phantom at the table and, purposely, kept that way in my opinion. And, looking back at it, do I look silly? I might. But looking at it from my perspective now, it is the same Bombardier that we were always dealing with. And maybe we should have been more careful, [Y]our Honor. But when you are dealing with people that – the people who we were dealing with at Bombardier, under the circumstances that we were dealing with them, it was a fragile enough transaction. We decided we would just go ahead and go with their wishes.

(Tr. at 104-06.)

Based on the above, this Court concludes that BAC did not exercise one of "purchase options pursuant to the relevant Purchase Documents" when it repurchased Gulf's interest under the Settlement Agreement. Accordingly, the Make Whole Fee was properly assessed pursuant to the terms of the Loan Agreement. See W.W.W. Assocs. v. Giancontieri, 77 N.Y.2d 157, 162 (1990) ("A familiar and eminently sensible proposition of law is that, when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms."); see also Reiss v. Fin. Performance Corp., 97 N.Y.2d 195, 198 (2001); Lazard Freres & Co. v. West*Group Props., 22 A.D.3d 45, 48, 799 N.Y.S.2d 437 (1st Dep't 2005).

III.     Breakage Fee

BCI seeks to recover a Breakage Fee for the cost it incurred in unwinding its SunTrust swap transaction under the indemnification provision of the Security Agreement:

> [Gulf] agrees to indemnify [BCI] from and against any and all claims, losses and liabilities growing out of or resulting from the Aircraft, this Agreement, any Loan Document and any Purchase Document and the transactions contemplated hereby and thereby (including, without limitation, enforcement of this Agreement), except claims, losses or liabilities resulting solely and directly from the Lender's gross negligence or willful misconduct.

(Tr. Ex. 5; Tr. at 167-68.) However, none of the financing documents reference a Breakage Fee, or disclose that BCI may enter into a swap transaction to hedge its exposure on Gulf's fixed interest rate loan. (Tr. Exs. 3-5; Tr. at 95, 167-68, 256, 262-65.) Moreover, BCI never advised Gulf that it entered into such a transaction or that in the event Gulf prepaid the loan, it would also be responsible for BCI's cost to unwind its related swap position. (Tr. at 33-34, 95-97, 228, 262-65.)

"New York law requires indemnification agreements to be strictly construed; a court cannot find a duty to indemnify absent manifestation of an unmistakable intention to indemnify." Manley v. Ambase Corp., 337 F.3d 237, 245 (2d Cir. 2003); see also Commander Oil Corp. v. Advance Food Serv. Equip., 991 F.2d 49, 51 (2d Cir. 1993). Indeed, "[t]he promise should not be found unless it can be clearly implied from the language and purpose of the entire agreement and the surrounding facts and circumstances." Hooper Assocs., Ltd. v. AGS Computers, Inc., 74 N.Y.2d 487, 491 (1989). Strictly construed, Section 9(a) of the Security Agreement does not capture losses resulting from an undisclosed, proprietary hedging transaction entered by BCI with an unrelated counterparty.

Indeed, at trial, BCI's Controller, Mark L. Boucher, acknowledged that the potential assessment of a Breakage Fee would be material information for a borrower. (Tr. at 248.) Further, Michel Bourgeois, Vice President and General Manager of BCI's Aircraft Finance Group, testified that BCI specifically addressed Breakage Fees in its agreements with other borrowers at the time of the Gulf transaction. (Tr. at 170.)

It is well-established that when sophisticated business people negotiate an agreement at arm's length, "courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include." Vt. Teddy Bear Co. v. 538 Madison Realty Co., 1 N.Y.3d 470, 475 (2004) (internal quotation omitted). Moreover, "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." Reiss, 97 N.Y.2d at 199, 799 N.Y.S.2d 437; see also Vt. Teddy Bear, 1 N.Y.3d at 475. Based on the above, this Court concludes that Section 9(a) of the Security Agreement does not reflect the unmistakable intention of Gulf to indemnify BCI for costs resulting from an undisclosed swap transaction. See generally In re Spiegel, Inc., No. 03-11540 (CB), 2005 WL 440321, at *3 (Bankr. S.D.N.Y. Feb. 18, 2005) ("[T]he Term Loan Agreement is devoid of any references to a swap agreement, therefore, the Debtors are not responsible for 'breakage costs' associated with such an agreement, nor are the Spiegel subsidiaries obligated to indemnify WestLB for any damages allegedly arising from WestLB's termination of the Swap Agreement with a third party. . . . WestLB assumed the risk of entering into the Swap Agreement with the third-party, and it must now assume the responsibility for its own termination damages."). Because Gulf is not liable to BCI for the Breakage Fee, this Court concludes that Mr. and Mrs. Evans are not liable for such a fee under their Guaranty.

## CONCLUSION

For the reasons set forth above, this Court finds that Gulf's payment of the Make Whole Fee in connection with the settlement transaction was appropriate pursuant to the Loan Agreement. Further, this Court concludes that BCI is not entitled to collect a Breakage Fee under the indemnity provision of the Security Agreement and that neither Gulf, nor the Evanses are liable to BCI for that amount. The parties will bear their own attorneys' fees and costs. The foregoing constitutes this Court's findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure. The parties are directed to submit a proposed judgment to this Court by February 27, 2006.

Dated: February 10, 2006
      New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.

*Copies mailed to:*

Robert B. Lovett, Esq.
Seyfarth Shaw LLP
World Trade Center East
Two Seaport Lane
Boston, MA 02210-2028
*Counsel for Gulf Islands Leasing, Inc.
Andrew L. Evans and Ann L. Evans*

Patrick P. Salisbury, Esq.
Salisbury & Ryan LLP
1325 Avenue of the Americas
7th Floor
New York, NY 10019-6026
*Counsel for Bombardier Capital Inc.*